SPEAR (PASSAIC ZINC CO. v.). See Case No. 10,789.

---

## Case No. 13,225.

### SPEAR v. STUART.

[See Case No. 13,223.]

---

## Case No. 13,226.

### SPEED v. SMITH.

[10 Int. Rev. Rec. 157; 3 Am. Law Rev. 779; [1] 16 Pittsb. Leg. J. 219; 2 Am. Law T. Rep. U. S. Cts. 149.]

Circuit Court, S. D. Mississippi. 1869.

WAR—COMMERCIAL RELATIONS—PROCLAMATION OF PRESIDENT—INTERNATIONAL LAW—PROBATE COURTS—JURISDICTION.

1. The proclamation of the president of April 19, 1861 [12 Stat. 1259], did not interdict commercial intercourse between the citizens of the states in rebellion and those of the other states.

2. Contracts made prior to July 13, 1861, were not invalidated by the operation of the principles of international law.

3. Construction of the statute of Mississippi touching jurisdiction of probate courts, guardian ad litem, &c.

HILL, District Judge. This bill in equity was filed by the complainant against the defendants for the foreclosure of a mortgage executed by the defendant, B. D. Smith, on the 1st day of May, 1861, to secure the purchase money by the defendant to complainant for the Lauderdale Springs property, situated in Lauderdale county, in said Southern district.

The pleadings and proof show the following facts: Thomas Adams was the owner in fee of said property and died intestate. Upon his death, the property descended to his three minor children, subject to the right of dower of his widow, who, with her said minor children, returned to Louisville, Ky., to the house of complainant, the brother of the widow, and uncle of the minors. C. H. Minge, a friend of the family, was requested to take out letters of guardianship from the probate court of Lauderdale county, for the minor children, and to procure a decree from said court, and sell said property, as it was going into dilapidation and waste, being valuable only as a watering place and summer resort for health and pleasure. The letters were granted, decree obtained, and sale made as requested; the purpose being to transfer the proceeds to Louisville, to be placed under the control of the mother of the minors, as their guardian. The widow relinquished her right of dower before the sale. The complainant at the sale became the purchaser, at the price $8,000: the sale was confirmed by the court, and deed made by the guardian to complainant. In August, 1860, through said Minge,

acting as his agent, complainant contracted to sell said property to said Smith for the sum of $10,000, payable in three annual instalments, with 8 per cent. interest. It was further agreed in that contract that when complainant executed a deed for the lands and improvements, Smith would execute his notes for the payment of the purchase money and a mortgage on the property to secure the same. Two deeds were made, which were not accepted, for the alleged reason that the acknowledgments were not sufficiently attested; one of which was that the state of Mississippi had ceased to be one of the states in the Union, and the acknowledgment should be made and attested as provided for deeds made in a foreign country. A deed was made in April, 1861, which was accepted, and the notes and mortgage executed by Smith according to said contract. Smith went into possession immediately upon the making of the contract, and remained in possession until October, 1864, when he sold and delivered possession to Hulburt, Sturges, and others. No part of said purchase money was paid in any manner until about the time, or after the sale, by Smith. Smith offered to pay the notes in Confederate treasury notes to Leachman, the attorney employed by Minge to prepare the deeds and to transact the business. The notes and mortgage were to have been sent to complainant at Louisville, Ky., but before it could be done, after their execution, intercourse between Mississippi and Louisville became somewhat hazardous; and they remained in the possession of Leachman, without any instructions from complainant, either to him or Minge, in relation to them. Complainant having engaged actively on the side of the United States in the war then being commenced between the Confederate States and the United States, no further communication was had between complainant and Minge or Leachman until after the close of the war.

When the proposition to pay in Confederate money was made, Leachman declined accepting it, believing that it would be worthless, at least to complainant. Smith threatened that if it was not accepted he would report the debt to the Confederate authorities, and have it confiscated, so that complainant would get nothing. Minge, who was the client of Leachman, directed him to accept it, saying that he had full confidence in the success of the Confederate cause, and would vest it in Confederate bonds, or in the purchase of cotton, and in that way save it for the minor children. Upon this instruction Leachman accepted the Confederate notes at par, and wrote a receipt across the face of the notes, acknowledging payment, and that it was in full satisfaction of the mortgage, and delivered the notes to Smith, but no satisfaction of the mortgage was entered on the record where the mortgage was recorded. The treasury notes received from Smith were paid over to Minge or his agents; what disposition was made of

---

[1] [3 Am. Law Rev. 779, contains only a partial report.]